In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00239-CR**
_____

**RUSTY LANE ZIPPRIAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Court at Law No. 5**
**Montgomery County, Texas**
**Trial Cause No. 22-370522**

**MEMORANDUM OPINION**

Rusty Lane Zipprian appeals from his conviction for the misdemeanor offense of assault causing bodily injury – family violence, against his wife, "Diane."[1] *See* Tex. Penal Code Ann. § 22.01(a)(1). The information alleged that Zipprian "intentionally, knowingly, or recklessly cause[d] bodily injury to [Diane] . . . by

_____

[1] We refer to the victim by a pseudonym. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

striking, grabbing, and pushing [Diane] with [Zipprian]'s hands[]" and that Diane is a member of Zipprian's family or household or a person with whom he has or has had a dating relationship. The jury found Zipprian guilty as charged. Based on an agreement Zipprian entered into with the State, the trial court assessed punishment at one year in county jail, suspended imposition of the sentence, placed Zipprian on community supervision for a year, and assessed a $500 fine. Zipprian timely appealed raising two issues. We affirm the trial court's judgment as reformed.

Evidence at Trial

Diane's Testimony

Diane testified that on July 30, 2022, she had an altercation with Zipprian, to whom she had been married for approximately six months. Diane identified the defendant at trial as Zipprian. Diane recalled that on July 30th, she, Zipprian, her six-year-old niece, and her four-year-old nephew attended Diane's friend's daughter's birthday party at a house in Porter, Texas. According to Diane, she drank "[m]argarita wine" from a 20-ounce tumbler until the other party guests arrived and then she drank water.

Diane recalled that after a couple of hours at the party, Zipprian got the truck keys from her purse, went to the truck, and honked the horn continuously to get Diane outside. She went outside, and he told her, "Let's go." Diane testified that they left to go to their home, and Zipprian drove, with Diane in the passenger seat and

2

her niece and nephew in the back seat. According to Diane, Zipprian was visibly upset and he told her that he did not like her friends.

Diane testified that on the way home, she told Zipprian she wanted a separation, and he got upset and said he would move out and find an apartment. She recalled that on the way home, she and Zipprian were "bickering[,]" and he became aggressive. She testified that in the area of their neighborhood, he steered the truck towards a dog in the oncoming lane, it appeared to her that he was driving intentionally toward the dog, she told him not to hit the dog, and she grabbed the steering wheel with her left hand and jerked the truck to the correct side of the road to avoid the dog. Zipprian reacted by grabbing her arm, she jerked her arm away, and he squeezed her arm with his fingernails cutting into her forearm. She testified that he was squeezing her arm for a couple of minutes, and she felt pain.

Diane recalled that once they got home, she knew the argument was not over, and she told her niece and nephew to go to the back bedroom. Diane and Zipprian bumped shoulders passing in the hallway of the house, and the confrontation started again with Zipprian yelling that he did not like her friends. According to Diane, Zipprian said he was going to pack his belongings and leave, they started shoving each other, and the altercation continued in the kitchen. Diane recalled that he shoved her against the refrigerator, and she fell to the ground. At that point, he climbed on top of her, put his hands around her neck, and said that he would kill her. She felt

3

scared and tried to fight him off by punching and scratching at him "anywhere and everywhere." She recalled that she was wearing her wedding band at the time and that her ring could have caused scratches or marks anywhere on Zipprian's face and arms because she "was grabbing at everything trying to get him off of [her]."

Once Zipprian got off of Diane, he went to the bedroom and Diane called 9-1-1. A recording of Diane's 9-1-1 call was admitted into evidence and played for the jury. Diane recalled that while she was on the 9-1-1 call, she was in the living room with her niece and nephew, and Zipprian knew she had called 9-1-1. According to Diane, Zipprian took one of his guns with him, got into his vehicle to leave, and once Diane provided the 9-1-1 operator with that vehicle's license plate, Zipprian switched vehicles and left in the other vehicle. Diane recalled that she told the 9-1-1 dispatcher that she fought back, punched and scratched Zipprian, and did everything she could to get him off of her. Diane testified that Zipprian's sister lived thirty minutes away, was not nearby the day of the altercation, and had no personal knowledge regarding the altercation.

Montgomery County Sheriff's Office deputies arrived, Diane reported what happened, and they took photographs of Diane. Zipprian did not return to the scene to meet with the deputies. The photographs taken of Diane at the scene were admitted into evidence and published to the jury. Diane testified that one of the photographs showed redness on her neck caused by Zipprian placing his hands around her neck,

4

another photograph showed her hands and injuries to her left hand middle finger caused by the altercation, another photograph showed a scratch on her thumb caused by Zipprian, and another photograph depicted the marks on her arm "[f]rom his nails digging into [her] arm." According to Diane, she was able to photograph her injuries from the altercation when the injuries were more visible two days later. Those photographs were also admitted into evidence and published to the jury. She testified that the photographs showed bruising from Zipprian shoving her against the refrigerator and marks and scratches from the altercation, including scratches on her chest and marks near her knee. She explained that they had outside surveillance cameras at the house, but the cameras did not capture any of the altercation because they did not cover the entire yard, and the altercation mostly took place in the truck and inside the house. Diane agreed that if she had attacked Zipprian he would have been entitled to defend himself.

Diane denied using the altercation as leverage in their divorce proceedings, and she testified that the divorce would not involve custody issues because they did not have children together and would not involve community property issues because they only owned separate property. She filed for divorce about a month after the altercation and around the same time that she provided the photograph of her injuries to the district attorney's office.

On cross-examination, Diane agreed that during the party Zipprian had informed her that his stepmother's electricity had gone out and that the breaker was switched back and that "it was okay" and "not a matter that he needed to fix today." According to Diane, Zipprian did not want to be at the party that day. She agreed that jerking the steering wheel of a car that someone is driving is unsafe, and that she punched Zipprian in the face after he grabbed her arm in the truck. She acknowledged that her report of what had happened was more detailed in the 9-1-1 call, but she disagreed that Zipprian was trying to leave the house when the altercation occurred. She agreed that she did not tell the responding officers that she punched, scratched, and bit Zipprian, and even though she told the officers where she thought Zipprian was going, she did not give the officers Zipprian's phone number for them to contact him. She also agreed that when she was on the phone with 9-1-1 dispatch, Zipprian put the gun in his car and walked back to the house and she locked him out. According to Diane, she was angry that day and wanted Zipprian to leave, and she had contacted a lawyer prior to this incident because she had planned to file for divorce.

Testimony of Deputy Lizbeth Rodriguez

Deputy Lizbeth Rodriguez with the Montgomery County Sheriff's Office testified that she responded to the scene around 6 p.m. in response to a "family violence in progress" at 5:17 p.m. Deputy Rodriguez spoke with Diane outside, who

6

was "very shaken up." Diane did not appear to be exhibiting signs of intoxication. Deputy Rodriguez testified that through her investigation she learned that the assault took place in the vehicle and in the house. Rodriguez recalled that she observed a scratch mark on Diane's left arm above her wrist and that Diane was complaining of pain on her right thumb. Diane reported that her husband, Zipprian, had caused her injuries. Deputy Rodriguez photographed the scene and attempted to follow up with Zipprian at a location where Diane thought he might be. Rodriguez testified that Zipprian was not at that location, and that when Zipprian contacted dispatch, Rodriguez was on another call and Zipprian met with a different deputy. Deputy Rodriguez recalled that she went to meet with him again on August 4th, she knocked and yelled out his name, she saw someone that appeared to be Zipprian inside, but no one answered the door. After her initial investigation and attempts to follow-up with Zipprian, as well as her review of a statement he provided to another deputy, Deputy Rodriguez filed an affidavit for a warrant for his arrest for assault family violence, which the judge signed. Rodriguez testified that she stood by her investigation and decision to file the warrant affidavit.

On cross-examination, Deputy Rodriguez agreed that she had noted in her report that the incident was alcohol related, and that Diane had mentioned that she and Zipprian had been at a party drinking. Deputy Rodriguez testified that she got Zipprian's phone number and a possible location for him from Diane, but that

Rodriguez did not indicate in the offense report that Diane had provided Zipprian's phone number, and Rodriguez could not recall if she called Zipprian or not. Rodriguez agreed that based on only evidence and facts she observed from Diane that she determined that Zipprian was the primary aggressor. Rodriguez agreed that it is important to get both sides of the story before requesting charges be filed, but that she made the decision to request charges be filed against Zipprian without calling him. Rodriguez acknowledged that she did not look or ask for video surveillance from the scene and agreed that if there was video surveillance that it could help her determine what had occurred. According to Deputy Rodriguez, at some point Zipprian contacted dispatch wanting to come in and make a statement, but Rodriguez was not there when he voluntarily made the statement. Rodriguez testified that photographs were taken of Zipprian's injuries.

Testimony of Deputy Paris Ponton

Deputy Paris Ponton with the Montgomery County Sheriff's Office testified she was on duty on the night of July 30, 2022, when Zipprian came to the station. Zipprian stated he was there to give a statement, and based on the location of the incident, Deputy Ponton was able to confirm with dispatch that Deputy Rodriguez was the responding deputy. Deputy Ponton was unable to contact Deputy Rodriguez, so Ponton accepted Zipprian's statement he had already written on the laptop he brought in, and she photographed his injuries. The photographs of his injuries were

8

admitted into evidence and published to the jury. Ponton testified that the photographs depict an injury above Zipprian's right eye and to the side of and below his right eye, and a small laceration on his right index finger. Deputy Ponton testified that it was not her intention to do any type of investigation into what happened but that she just added a supplement to the investigation stating that she had taken the photographs and accepted Zipprian's previously-written statement. According to Deputy Ponton, Zipprian was cooperative. Deputy Ponton agreed that if the incident was reported at 5 p.m. and Zipprian came in to give his statement around 8:30 or 9 p.m., that it was reasonable to determine that he had about a three-or-four-hour span to come up with his story about self-defense.

Zipprian's Testimony

Zipprian testified that he and Diane were married on November 20, 2021, and that they were in the process of a divorce. Zipprian testified that the house where he and Diane lived was her house since 2019, but that he had invested money in it.

According to Zipprian, on July 30, 2022, he agreed to go to a birthday party, Diane drove them in the truck, and they arrived at the party twenty miles away at around 11:15 a.m. Zipprian recalled Diane drinking margaritas out of a tumbler at the party while she played cards for around an hour and a half, and he sat on the couch alone and Diane's niece and nephew were playing outside. He testified that Diane drank a little less than half of a bottle of the "margarita wine" she brought

9

from home, the bottle "looked like a fifth of Jack Daniels," and at times she drank straight from the bottle.

Zipprian testified that after Diane finished playing cards they went out on the front porch and she encouraged him to drink, which he did not want to because he was not a big drinker, and to play cornhole, which he did not want to because he was tired and did not want to be in the sun. While people were playing cornhole and drinking, Zipprian drank some of his beer because Daine pressured him to, and she continued to drink "margarita mix[.]" Zipprian recalled that a strong storm rolled in, and while it stormed, the kids opened presents until around 4 p.m. when the party was winding down. Zipprian testified that he received a call from his father's widow, and Zipprian told Diane that his father's widow had lost power at her house and that they needed to go there and fix it. According to Zipprian, they started packing up, he put some things in the back of the vehicle, and he got in the driver's seat of her unlocked truck because he was not going to let her drive because of how much alcohol she had consumed.

Zipprian did not have a key to the truck, so he stayed in the hot truck for about a minute and a half, and he honked the horn while Diane and her friend were talking on the front porch, which upset Diane. Diane and the two children got into the truck. Zipprian recalled that about six minutes from home, a dog was in the middle of the roadway along with oncoming cars in the distance, so he wanted to get close to the

dog, hit the brakes, and slam on the horn so that the dog would run away and avoid being hit by any of the vehicles and that Zipprian could still have time to get back over and avoid the oncoming traffic. According to Zipprian, as he started to scare the dog off the road, Diane reached for the steering wheel with both hands and jerked it to the left towards the oncoming vehicles. He testified that he slowed the truck, jerked her wrist up, regained control of the vehicle, and told her never to do that again. Zipprian recalled that Diane slapped his glasses off which scratched his face. He testified that she grabbed the steering wheel again and jerked back to the left into the oncoming lane. He again swept her hand off the steering wheel, slammed on the brakes, and Diane began hitting him in the face. He grabbed her hand and squeezed her knuckles, injuring her thumb.

Once home, Zipprian tried to hide Diane's keys inside, got a drink from the pantry, and intended to leave the house to go to his father's widow's house to work on the electricity. According to Zipprian, as Diane approached him at a narrow part of the house, she "thr[ew] her shoulder" into his, spun around, and punched him in the back of his head. He recalled he instantly responded by throwing her at the refrigerator and told her "Don't ever do that again, I can kill you by doing that[,]" which he explained meant that an automatic response can kill someone even if there is no intent to hurt someone. He testified that when he tried to leave the house, she grabbed his shirt and dragged him back into the kitchen, threw him into the kitchen

11

and against the pantry door, and hit him repeatedly. He recalled grabbing her left arm, which is what he believed caused her injuries to her arm, slapped her in the back of the head, and then "[s]he settled down quite a bit[.]" He testified that on his third attempt at leaving, she grabbed him, raised her leg and "kneed" his right inner thigh, slipped because she had socks on, and fell while also pulling him to the ground. He recalled her kicking him a second time. He "slammed" the water bottle he had taken earlier from the pantry against her leg. According to Zipprian, he tried to leave a fourth time and Diane started punching him, and he used a self-defense technique applying pressure to a spot to subdue her, she grabbed his wrist, and he spun her around and told her, "You can't do anything, you might as well [] settle down." He recalled that she raised her leg and almost kicked a hole in the kitchen cabinet, he forced her to the ground, then immobilized her by putting his legs on both sides of her ribs, and the children were watching. He testified that she screamed, "[H]e's beating me[,]" and he told her, "no one is beating you." Diane yelled for her niece to call 9-1-1 and Zipprian told the niece that he and Diane were just wrestling. He recalled that he went to remove his father's revolver from the house so Diane could not sell it, but he could not find it, and he instead retrieved another one of his guns because a month and a half earlier Diane had been suicidal. He left with the gun, a water bottle, and his backpack. He put the belongings in the truck, went to get the rest of his guns from the house, saw Diane inside reading the license plate of the

12

truck, assumed she had locked the door to the house, contemplated what to do, and then moved his belongings to his car and left. He then called his sister. He testified that later that night he wrote his statement, took photographs of his injuries as suggested by his sister, sent the photographs to his sister, and then met with his sister. The photographs of his injuries were admitted into evidence and published to the jury. He testified that one of the photographs depicts his injured right index finger, where his hand hit Diane's tooth in the vehicle, and she bit his hand, and another photograph showed swelling in his cheek area from where she hit him. He recalled that one of the other photographs that was taken on a later day showed he had bruising under his eye. He testified that the injuries to his right eye and to the right of his mouth depicted in the photographs were caused by Diane.

According to Zipprian, he did not intend to hurt Diane, he did not initiate any of the multiple entanglements with her that day, and he only tried to "diffuse the situation with discomfort[]" and get away from her. He testified that when he gave his statement to the police that he did not want Diane charged with assault, she was "not in her right mind" and had been drinking at the time of the incident, and at that time he still was in love with Diane. On cross-examination, Zipprian agreed that he knew what he was doing on the day of the incident, he had only consumed "maybe a quarter" of his beer the entire day, and that he caused bodily injury to Diane that day but "not on purpose[.]"

13

<u>Testimony of Zipprian's Sister</u>

Zipprian's sister testified that Zipprian called her between 5:15 and 5:30 p.m. on July 30, 2022, and he told her what had happened but did not express concern that he had done anything wrong. She saw him later that day and observed that he had scratches and a black eye.

### Sufficiency of the Evidence

In his first issue, Zipprian challenges the sufficiency of the evidence supporting the jury's implicit finding that Zipprian did not act in self-defense and supporting the jury's verdict. According to Zipprian, Diane's testimony implies that she and Zipprian engaged in "mutual physical aggression[,]" their testimony "differ[s] regarding the extent and manner of physical contact made[,]" and "the evidence establishes that [Diane] was initiating the assaultive behavior and made no attempt to abandon her attack." Zipprian argues that, viewing the evidence in the light most favorable to the verdict, the evidence is insufficient to support the jury's implicit finding that he did not act in self-defense.

It is the defendant's burden to produce some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Upon producing such evidence, the State has the burden of persuasion to disprove the defense. *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991). The State is not required to produce evidence to refute the claim but is required to prove its

case beyond a reasonable doubt. *Id.* at 913. The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject the defensive issue. *Id.* at 913-14. A jury's verdict of guilt is an implicit finding rejecting a defendant's self-defense theory. *Id.* at 914.

We review all of the evidence in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010). Because the State carries the burden of persuasion to disprove self-defense beyond a reasonable doubt, we review a challenge to the sufficiency of the evidence supporting a jury's rejection of a claim of self-defense under only the *Jackson* standard. *Saxton*, 804 S.W.2d at 914.

In reviewing the evidence, we give deference to the jury to resolve any conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We treat direct and circumstantial evidence equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The fact finder is entitled to judge the credibility of

witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

A person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to another. Tex. Penal Code Ann. § 22.01(a)(1).[2] The jury heard Diane's testimony that Zipprian, her husband at the time of the incident, became aggressive with her on the way home from a party. The jury heard Diane testify that Zipprian reacted to her grabbing the steering wheel when she believed the truck would hit a dog, that Zipprian grabbed her arm and that he squeezed her arm with his fingernails cutting into her forearm and causing her pain. Diane testified that their argument continued at home, where Zipprian shoved her against the refrigerator causing her to fall to the ground, he climbed on top of her, put his hands around her neck, and said that he would kill her. The jury heard Diane's testimony that she tried to fight him off by punching and scratching at him "anywhere and everywhere[,]" and that she called 9-1-1. The jury heard Diane testify that he took a gun with him and that when he saw her providing the 9-1-1 operator with the truck's license plate, Zipprian switched vehicles and left in the other vehicle. The jury viewed the photographs of both Zipprian's and Diane's injuries and heard the recording of the 9-1-1 call. The jury also heard Deputy Rodriguez's testimony that

---

[2] A first family-violence assault is treated like an ordinary bodily-injury assault (a class A misdemeanor), but any subsequent family-violence assault can be punished as a third-degree felony. *See* Tex. Penal Code Ann. § 22.01(b)(2)(A).

16

Rodriguez agreed that based on only evidence and facts she observed from Diane that she determined that Zipprian was the primary aggressor, and that she stood by her investigation and decision to file the warrant affidavit for Zipprian's arrest. The jury was also presented with Zipprian's version of the events, wherein he stated that after she grabbed the steering wheel on the way home from the party, he grabbed her hand and squeezed her knuckles, injuring her thumb. The jury was presented with his testimony that Diane repeatedly assaulted him and that he responded by throwing her against the refrigerator, grabbing her left arm, slapping her in the back of the head, hitting her in the leg with a water bottle, and subduing her. The jury heard Zipprian admit that he left the scene with a gun before law enforcement arrived, that he switched his belongings to his car and left in the car after Diane called 9-1-1 and provided the dispatcher with the license plate for the truck, and he admitted that he caused Diane bodily injury.

The jury was not required to believe Zipprian's version of what transpired that day. *See Chambers*, 805 S.W.2d at 461. After viewing the evidence in the light most favorable to the verdict, we conclude a rational jury could have found the essential elements of the offense beyond a reasonable doubt and also could have found against Zipprian on his self-defense claim. *See Brooks*, 323 S.W.3d at 894-95; *Saxton*, 804 S.W.2d at 913-14. We overrule issue one.

## Denial of Motion for New Trial

In his second issue, Zipprian argues that the trial court abused its discretion in denying Zipprian's motion for new trial raising his claim of ineffective assistance of counsel. A defendant has a Sixth Amendment right to the effective assistance of counsel at trial. U.S. Const. amend. VI; *see Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). To establish that he received ineffective assistance of counsel, Zipprian must demonstrate that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) (citing *Strickland*, 466 U.S. at 687). The party alleging ineffective assistance has the burden to develop fact and details necessary to support the claim. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). A party asserting an ineffective-assistance claim must overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 689). An appellant's failure to make either of the required showings of deficient performance or prejudice defeats the claim of ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *see also Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App.

2009) ("An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong.").

The right to effective assistance of counsel ensures the right to "reasonably effective assistance[,]" and it does not require that counsel must be perfect or that the representation must be errorless. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). The appropriate context is the totality of the representation; counsel should not be judged on isolated portions of the representation. *See Thompson*, 9 S.W.3d at 813; *Solis v. State*, 792 S.W.2d 95, 98 (Tex. Crim. App. 1990).

We review a trial court's ruling on a motion for new trial for an abuse of discretion, "reversing only if the trial judge's opinion was clearly erroneous and arbitrary." *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012). We view the evidence in the light most favorable to the trial court's ruling, must not substitute our judgment for that of the trial court, and must uphold the ruling if it is within the zone of reasonable disagreement. *Id.*; *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). A trial court abuses its discretion in denying a motion for new trial if no reasonable view of the record could support its ruling. *Riley*, 378 S.W.3d at 457; *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).

In his motion for new trial, Zipprian argued that he was denied his right to effective counsel at trial because defense counsel failed to investigate and prepare

19

adequately for trial by failing to interview and present witnesses who could have provided evidence to support Zipprian's theory at trial. In his motion, Zipprian argued he should receive a new trial and "[t]here is a reasonable probability that evidence of [Diane]'s violent reputation and [Zipprian]'s peaceful reputation would have influenced at least one of the jurors' verdicts." Zipprian attached to his motion declarations from three individuals: (1) Diane's ex-boyfriend, who stated that he dated her in 2013 and 2014, that she had a reputation for being untruthful, that she was the first aggressor in verbal arguments, that she falsely told people he assaulted her for the attention, and that he would have been available to testify; (2) Zipprian's ex-girlfriend, who stated that she dated Zipprian in 2013, that she believed he was a non-violent person, and that she would have been available to testify at trial; and (3) Zipprian, who stated that his conversations with defense counsel in preparation for trial lasted less than thirteen minutes, that defense counsel did not ask Zipprian to provide names of anyone who would testify as to his peaceful reputation, and that he did not know this information would have been helpful at trial.

At the hearing on the motion for new trial, defense counsel testified that in preparation for trial he spoke with Zipprian for more than thirteen minutes and that he was corresponding with and receiving a lot of information from Zipprian that defense counsel reviewed. Defense counsel recalled that he and Zipprian discussed "a lot of strategy in the case[,]" defense counsel agreed that this was a "he-said-she-

said case[,]" and defense counsel testified that to his knowledge there were no third-party witnesses to the offense. Defense counsel testified that it appeared from an e-mail he exchanged with Zipprian while preparing for the case that Zipprian had asked if he could provide defense counsel with a list of character witnesses that could have helped in his case, but defense counsel could not recall whether he asked Zipprian to follow up and provide the names of those character witnesses, and he could not recall ever receiving contact information for any potential character witnesses. Although defense counsel agreed that he should have asked for the names of such potential witnesses, he still would have had to determine whether those potential witnesses would qualify as reputation witnesses. According to defense counsel, he typically explains to his clients that character witnesses must "meet the criteria to become a character witness both as to truthfulness and as to peaceful and law-abidingness in an assault situation." Defense counsel testified that there is always a concern that character witnesses can potentially "open the door" to "have-you heard questions" and that defense counsel was concerned about "opening the door" to the history of confrontations between Zipprian and Diane of which defense counsel was aware. Defense counsel testified that his trial strategy in this case was "to keep the case narrowly focused" on the incident that occurred on July 30, 2022. Defense counsel testified about the risk that even if a character witness is asked a "have-you-heard" question and the witness answers "no," the subject matter is still

21

before the jury. According to defense counsel, the criteria for a reputation witness would require recent contact between Zipprian and the witness. The three declarations attached to Zipprian's motion for new trial were admitted into evidence at the hearing. Defense counsel also testified that although Diane's ex-boyfriend's declaration stated that she verbally provoked him to assault her, under Texas law, mere words are not enough to justify an assault and that what would have been relevant for Zipprian's trial would be actual physical contact by Diane against Zipprian "[s]o provocation really wasn't relevant to what we were defending in terms of verbal provocation." The trial court denied the motion for new trial.

On appeal, Zipprian asserts the following:

Trial counsel could not make in informed, strategic decision not to call character witnesses to testify at appellant's trial because [defense counsel] failed to conduct any investigation into their existence or availability. Although appellant offered to provide counsel with a list of witnesses, counsel did not follow up on this offer and failed to conduct his own investigation. These witnesses would have helped appellant establish his defense that he is a peaceful person and was only attempting to ward off an unwanted attack by his wife.

Defense counsel testified that the issue of character witnesses was brought up in an e-mail between him and Zipprian, but that Zipprian never provided contact information for any potential character witnesses. Defense counsel also explained at the hearing that character witnesses in this case, assuming they even qualified as a character witness, could have "opened the door" to questions regarding Zipprian's

22

history of confrontations with Diane, which could have been detrimental to Zipprian's defense.

We conclude based on the record that Zipprian has failed to show that counsel's performance was deficient or that if the witnesses had testified that the result would have been different. *See Garcia*, 57 S.W.3d at 440 (citing *Strickland*, 466 U.S. at 687). Furthermore, viewing the evidence in the light most favorable to the trial court's ruling, the trial court's ruling was within the zone of reasonable disagreement, and we cannot say that the ruling was clearly erroneous or arbitrary. *See Riley*, 378 S.W.3d at 457. We conclude the trial court did not abuse its discretion in denying Zipprian's motion for new trial. *See id.* We overrule issue two.

We note that a section of the judgment includes "Plea to 1st Enhancement Paragraph: TRUE" and "Findings on 1st Enhancement Paragraph: TRUE[.]" The information under which Zipprian was charged did not allege an enhancement, and the proceedings do not reflect that the State alleged an enhancement nor that the trial court made a finding of "true" to any prior convictions. This Court has the authority to reform the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27-28 (Tex. Crim. App. 1993). We therefore reform the trial court's judgment to delete "TRUE" and substitute "N/A" to both the "Plea to 1st Enhancement Paragraph" and "Findings on 1st Enhancement

23

Paragraph[.]" Having overruled Appellant's issues, we affirm the trial court's judgment as reformed.

AFFIRMED AS REFORMED.

LEANNE JOHNSON
Justice

Submitted on March 3, 2025
Opinion Delivered March 26, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.